In the Matter of the Estate of Giuseppe Togneri, Deceased.
Fred Togneri, Appellee, v. Gabriele Bonaldi, Appellant.

Gen. No. 39,854.

34

Opinion filed June 21, 1938.   Rehearing denied July 7, 1938.

Leon Lecour Drolet, of Chicago, for appellant.

Krinsky, Levitan & Glassner, of Chicago, for appellee.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

Giuseppe Togneri, a resident of Chicago, died intestate in Italy, August 15, 1932. In September, 1932, letters of administration were issued by the probate court of Cook county to one Gabriele Bonaldi, a cousin of the deceased, who made proof of heirship, testifying that deceased was unmarried and left him surviving a brother, five sisters, two nephews and a niece, and a table of heirship was entered by the court accordingly. November 10, 1933, Bonaldi, as administrator, filed his final account reporting distribution of the balance of the estate, amounting to $3,975.73 in cash, in accordance with the court's finding of heirship. The account was approved, and the administrator discharged by the probate court.

Some three years later, December 8, 1936, Fred Togneri, hereinafter referred to as petitioner, filed a petition in the probate court alleging that he was the son of Giuseppe Togneri, deceased; that when Bonaldi filed his petition for appointment as administrator and at the time when proof of heirship was made, Bonaldi knew that decedent was in fact married and had a child, Fred Togneri, the petitioner, who was then living; and the petition prayed that the order approving the final account and report of Bonaldi as administrator be vacated and set aside and for an order on Bonaldi to pay petitioner, as the son and only heir of Giuseppe Togneri, deceased, the entire proceeds of the estate. After a hearing on the petition the probate court on May 12, 1937, entered an order denying the relief prayed. Petitioner perfected an appeal to the circuit court where a trial *de novo* was had, and on June 30, 1937, an order was entered allowing the petition and ordering Bonaldi, the respondent, to pay petitioner, as the only heir of deceased, the sum

of $3,975.73 which had previously been distributed and paid to the brothers and sisters, nephews and niece of the deceased. Respondent appeals from the order of the circuit court thus entered.

Petitioner takes the position that the probate court, in the exercise of its equitable powers, and the circuit court on appeal from the probate court, had the power to vacate its order of November 10, 1933, approving the final report and account of the administrator, and to direct him to pay petitioner the amounts which had previously been distributed and paid to those shown by the table of heirship. It is urged that no proper adjudication of the rights of interested parties can be made, unless and until jurisdiction by personal or constructive service, is obtained; that a court, in order to enter a final and binding order, must have jurisdiction of the parties as well as the subject matter; and that since petitioner had not yet reached his majority he is to be considered as the ward of the court, whose duty it is to see that his rights were properly protected. These various contentions resolve themselves into the controlling question, whether, in the absence of fraud, an administrator, who in good faith complies with the order of the court in the distribution of an estate, is protected by such order. This requires a consideration of the fundamental nature and purpose of proceedings for administration of the estates of deceased persons, which is well stated in *Tilt v. Kelsey*, 207 U. S. 43, 55, as follows:

"When the owners of property die, that property, under the conditions and restrictions of the law applicable, is transmitted to their successors named by their wills or by the laws regulating inheritance in cases of intestacy. For a suitable time it is essential that the property should remain under the control of the state, until all just charges against it can be dis-

covered and paid, and those entitled to it as new owners can be ascertained. . . . It is the duty of the sovereign to provide a tribunal, under whose direction the just demands against the estate may be determined and paid, the succession decreed and the estate devolved to those who are found to be entitled to it. . . . Somewhere the power must exist to decide finally, *as against the world,* all questions which arise in the settlement of the succession. *Mistakes may occur and sometimes do occur, but it is better that they should be endured than that, in a vain search for infallibility, questions shall remain open indefinitely.*" (Italics ours.)

The law is well settled that the judgment of the probate court, settling the estate of the deceased, was a judgment *in rem.* In *Mosier v. Osborn,* 284 Ill. 141, the court said (p. 147): "The administration of an estate in the probate court is not an action between party and party but is in the nature of a proceeding *in rem* acting directly on the *res,* which is the estate of the deceased. If the court has jurisdiction of the estate and the jurisdiction is properly invoked the decree of distribution is a judgment *in rem,* which conclusively determines rights of all parties interested just as fully as a decree in admiralty or any other court. (*Ladd v. Weiskopf,* 62 Minn. 29.)" And it has been held that, in the absence of fraud, a judgment *in rem* binds all the world, irrespective of whether the persons bound are or are not parties to the litigation. (15 R. C. L., sec. 84, p. 641; Freeman on Judgments, 5th ed., vol. 3, par. 1520, p. 3117.)

*Cleaveland v. Draper,* 194 Mass. 118, involved the estate of one Sarah A. Ellis, deceased. February 27, 1904, a decree of distribution was entered directing payment of the entire balance in the hands of the administrator to Frank H. Skinner, a nephew, who was

adjudged by the court to be her next of kin. The funds were distributed by the administrator after he had made an investigation and had been duly advised through reliable sources that Skinner was the closest living relative. Subsequently, March 1, 1905, a petition was filed on behalf of three grandchildren of deceased, asking that the order of distribution be set aside and vacated. The petition was allowed and an order was entered vacating the former order of distribution, "for the purpose of correcting a mistake of fact." The validity of this order was not raised on appeal but subsequently, on October 30, 1905, the three grandchildren petitioned for a new decree of distribution of the estate to themselves as the only heirs of decedent, and an appeal was taken from the order of the probate court denying the petition. In discussing the question under consideration, the court said (p. 122): "In the present case the court had jurisdiction of the settlement of the estate of Sarah A. Ellis and it had jurisdiction of the property to which the order of distribution relates. It was the duty of the court, after the payment of the debts and the lapse of such time as would enable it to act advisedly, to determine who was entitled to the balance of the estate and to order a distribution of it. A petition for an order of distribution is in the nature of a proceeding *in rem,* and the court unquestionably has jurisdiction in such cases. . . . If a mistake of law or fact is made in a decree of distribution, the consequences are not different from those following mistakes in other judgments or decrees. *A decree of distribution is a protection to an administrator who acts in good faith under it. . . . We are of opinion that the administrator is entitled to the protection given him by the order and that the last decree of the probate court is correct.* If Skinner who received the money should

acquire property, he may be compelled to refund. If he continues financially irresponsible, the petitioners will suffer from a misfortune *for which the respondent is not blamable."* (Italics ours.) The petitioner in that case charged fraud on the part of the administrator, but the court held that the evidence did not establish the charge.

In the case of *In re Coyne's Estate,* 103 Okla. 279, 229 Pac. 630, an error in the distribution of the estate was discovered before the final order discharging the administrator had been entered; nevertheless the court held that the administrator, while acting in good faith in making a partial distribution, should be protected. Coyne had died intestate April 27, 1918, and his brother and one Rodolph were appointed administrators. In August, 1919, the county court made a finding that certain collateral relatives were the heirs of the decedent, and on the petition of the administrators entered an order of partial distribution to them. Evidently the administrators honestly believed the collateral relatives to be the heirs, and the order of the court was complied with by the administrators. In December following, Mary Hilton, a daughter of the deceased, accidentally learned of his death, immediately intervened in the county court and succeeded in satisfying the court that she was in fact the daughter and sole heir of P. E. Coyne. An order was thereupon entered setting aside the decree of heirship and declaring her to be the only heir of the decedent. Mary Hilton appealed from a ruling of the court overruling her objection to the final account, wherein the administrators took credit for the partial distribution to the collateral heirs, and in discussing this phase of the case, the court said (pp. 280–282): "It is admitted, as we understand it, that the disbursements made by the administrators under the orders of

August 12, 1919, were made by them in good faith.
. . . We are therefore of the opinion that the order
of partial distribution . . . was valid, and that the
administrators, acting in good faith thereunder in the
disbursement and distribution of funds of the estate,
are protected.'' Citing *Teague v. Smith*, 85 Okla. 12,
204 Pac. 439; *Frazer v. Page*, 5 Ky. Law Reports 790;
*Charlton's Appeal*, 88 Pa. St. Rep. 476; *Cowie v.
Strohmeyer*, 150 Wis. 401; *Harris v. Starkey*, 176
Mass. 445.

*Charlton's Appeal*, cited in the *Coyne* estate opin-
ion (103 Okla. 279), involved the estate of a decedent
who died intestate January 27, 1875. More than a
year later her administrator filed his account showing
a balance of some $2,300, which was approved by the
court, and the proceeds in the estate awarded to de-
cedent's daughter, Mrs. Conrad. In April, 1876, Wil-
liam Charlton, alleging that he was the husband of
deceased, filed exceptions to the confirmation of the
administrator's account, and also a petition for re-
view. The court opened the adjudication to permit
him to be heard. For some reason the administrator
received no notice of the filing or pendency of this
petition, and on May 9, 1876, complied with the court's
order of April 3 and paid the funds to Mrs. Conrad.
Later, in December, 1876, the court entered an order
correcting its previous adjudication and ordered the
administrator to pay William Charlton, as husband
of the deceased, one-half of the balance remaining for
distribution. The administrator appealed, and the
court finding that the administrator had received no
notice of the proceedings for review when he made
distribution in May, 1876, said (p. 477): ''If the sum,
or any part of it, was actually paid over according to
the decree before notice of the application for review,
both the express provisions of the act of 1840, and the

plain dictates of justice and equity, require that the appellant should be protected. . . . The decree of the 3rd of April, 1876, determined definitely that Mrs. Conrad was entitled to the whole sum of $2,351.56. . . . It was a final adjudication that she was the sole distributee, and when her claims were met and satisfied, that was an end of the matter."

In *Exton v. Zule,* 14 N. J. Eq. 501, an administrator who had made distribution to persons other than the rightful heirs, under an order of court, was protected by the court's order, and it was held (p. 505): "The decree of distribution is in its nature a final decree. It concludes the rights of all parties, unless appealed from within six months from the time of making the decree. . . . There is no suggestion or pretence of any fraud or collusion in obtaining the decree, or in making distribution under it. It is conceded that the administrator acted in perfect good faith and in strict accordance with the decree of the court. . . . All he could ask or obtain at the hands of the court was indemnity in the performance of his official duty. . . . It may be true that neither the first nor the second set of claimants are the real next of kin of the intestate— that the parties actually entitled are yet undiscovered. But this will not authorize the Orphans Court, upon every new ray of light that may be received, to set aside their own decree lawfully made, and compel the administrator to pay the estate over again to every new claimant. It is the duty of the court, before the decree of distribution is made, to see that the case is clearly proved. If there be reasonable room for doubt as to the rights of the parties the decree should be denied. *When once made, and not appealed from, it operates as an effectual shield to the administrator, and protects him against all other claimants. If a party entitled to a distributive share is by the decree*

*deprived of his rights without actual notice and without a hearing, his only remedy is against the distributees who have received the estate. . . .''* (Italics ours.)

Likewise in *Sayre v. Sayre,* 16 N. J. Eq. 505, the court, in discussing the question under consideration, said (p. 509): `` . . . The decree would be an effectual protection to the administrator, against all claims for moneys paid pursuant to the decree, although it should prove that the decree was erroneous and the money paid to a party not entitled. The remedy in such case, by a party who has been deprived of his rights by the decree, is not against the administrator, but against the distributees who have wrongfully received the estate. In their favor, as against the rightful claimant, the decree would not operate.''

It is obvious from these decisions that in the absence of fraud courts will afford protection to an administrator who in good faith has distributed the assets of the estate pursuant to the court's order, and that the ordinary rules governing jurisdiction by personal or constructive notice are not applicable to the administration of the estates of deceased persons. Since proceedings in the probate court are not actions between party and party, but rather in the nature of a proceeding *in rem,* acting directly on the *res,* which is the estate of the deceased, interested parties under legal disability are also bound by a judgment which operates on the *res* as distinguished from one which operates against persons. In discussing a decree of distribution, the court, in *Ladd v. Weiskopf,* 62 Minn. 29, specifically touched upon its binding effect on persons under disability, as follows (p. 35): ``It is binding and conclusive upon all persons interested in the estate of the deceased, whether under disability or not, or whether then in being or not. . . . Counsel admits the general rule, but insists that it is inapplicable to persons who were not born when the decree was rendered

. . . that such persons cannot be parties to the proceeding . . . and hence are not bound by it. This argument is based upon a false conception of the nature of the proceedings. . . ."

This leads to a consideration of the remaining question, namely, whether the fraud charged in the petition of Fred Togneri was sufficiently shown by the required degree of proof. From evidence adduced upon the hearing in the circuit court it appears that respondent had known the deceased for over 20 years. Togneri first came to Chicago in 1911 or 1912, and remained for about a month or two. He then returned in 1917 or 1918, lived at respondent's home with his family and worked together with him at the De Prado Statutary Company continuously from that time until July or August, 1931, when he left for Italy, where he died. In making proof of heirship Bonaldi was asked whether the deceased had ever told him that he had been married, and he answered, "Never; no." Asked whether Togneri had at any time told him that he had lived with any woman, Bonaldi answered as follows: "I asked him one evening 'Why don't you get married,' and he answered, 'I don't get married, because I had immoral relations with a woman and there was baby born, and he died.' "

To sustain the charge of fraud petitioner offered the testimony of Nicolina Rachiele, mother of petitioner, and the divorced wife of Giuseppe Togneri, the deceased. She then resided in Pittsburgh, Pa., and testified that she had been married to decedent on October 19, 1914, in Milwaukee, Wisconsin; that about a month later she came to Chicago with her husband and visited during the day and overnight at the home of Bonaldi, the administrator; that she had never seen Bonaldi thereafter, and was divorced from Togneri, the decedent, in Milwaukee in 1917; that Fred, the petitioner, was born of this marriage July 3, 1915, and had

lived with her ever since; that the divorce decree made provision for the care of the minor child, but no payments were ever made by decedent, who left her before the divorce and never communicated with her thereafter.

Bonaldi categorically denied that Togneri and his wife had ever visited them in Chicago. He testified that he knew the persons named in the table of heirship, having met them when he was a boy in Italy; that when he was appointed administrator of the estate he believed Togneri's heirs to be as he found them, and paid out the money under the belief that they were the only heirs at law. After his appointment as administrator he located a safety deposit box at the bank, which was opened in the presence of an attorney named Ragalo and a representative of the court. In this box he found a sealed letter on the envelope of which was written, in the decedent's handwriting, "Not to be opened until I die." The letter within the envelope, written in the decedent's handwriting, was introduced in evidence, and translated reads as follows: "Giuseppe Togneri, January 7, 1932. I declare to leave brothers and sisters and $1,000 to Fannie and her brothers, and also take out the expenses for the funeral and a monument of $500. Think of my closest relatives who are Fannie and her husband and Gabriele Bonaldi. Now then you have read and you will do what it says. Again I sign Giuseppe Togneri."

Respondent testified that he had never seen petitioner before he appeared in court; that when the money was paid out by him as administrator he had "no idea that he had a son living"; and that when decedent left to go to Italy, where he died, he departed with the intention of being married there. It appears from the evidence that after the payment of costs and administration expenses respondent paid to Dr. G. Castruccio, Royal Italian Consul General, as legal rep-

resentative of the heirs, the following sums: 1/7 to Alberto Togneri—$567.96; 1/7 to Zaira Togneri—$567.96; 1/7 to Teresa Togneri—$567.96; 1/7 to Maria Togneri—$567.96; 1/7 to Diumira Togneri—$567.96; 1/3 of 1/7 to Vittorio Togneri—$189.32; 1/3 of 1/7 to Alfredo Togneri—$189.32; 1/3 of 1/7 to Fannie Bertolozzi—$189.33. The final account was signed and verified by Bonaldi, as administrator, and was approved in open court November 10, 1933, by John F. O'Connell, judge of the court.

It is argued by petitioner that by reason of the alleged visit of the decedent and his wife at Bonaldi's home, where they stayed overnight, respondent had knowledge of the marriage of decedent and that the evidence disclosed no knowledge on the part of respondent of the subsequent divorce; and that by reason of the conversation related by respondent with reference to decedent having had immoral relations with a woman and the subsequent birth of a child, who had died, respondent "was put on notice that there had been a child born to the decedent." We are unable to follow the logic of this argument. Respondent categorically denied that the decedent and his wife had ever visited in his home or that he ever knew that he had a wife, and the conversation with decedent about his having had immoral relations with a woman resulting in the birth of a child who had died, would not tend to put the administrator on notice that there was a child living.

The law is well settled that if fraud is exercised in procuring a judgment, the court has jurisdiction to vacate the same. (*Ashkinzae v. Jacobson,* 337 Ill. 141.) Where fraud is charged, however, the burden is upon the person alleging it to establish the charge by clear and convincing evidence. (*People v. Hammond,* 356 Ill. 581.) Respondent is entitled to the advantage of the presumption that he acted in good faith and with

honest motives until the contrary is clearly established, and the court will not infer fraud on his part unless the facts and circumstances are inconsistent with an honest purpose and a pure intention. After a careful examination of the evidence, we have reached the conclusion that petitioner failed to establish fraud as charged. Respondent was not one of the distributees, and evidently had no ulterior motive in making false proof of heirship, as charged. The letter found in the safety deposit box furnished no clue to any heirs except the brothers, sisters, nephews and niece of the deceased, and there is no evidence from which the court could fairly find that fraud had been exercised by the administrator.

The opinion in this cause was written May 5, 1938, but before the filing thereof the death of Bonaldi, administrator, was suggested and a motion made by appellee that any order entered on the appeal be entered *nunc pro tunc* as of a date prior to May 30, 1938. Under the circumstances, we are of the opinion that the judgment of the circuit court should be reversed *nunc pro tunc* as of the date of May 5, 1938, and it is so ordered.

*Reversed.*

SCANLAN and JOHN J. SULLIVAN, JJ., concur.